**GRETNA MACHINE AND IRON WORKS, INC. and The Fidelity and Casualty Company of New York, Plaintiffs,**

v.

**Raymond E. NEUMAN, Deputy Commissioner, United States Employees Compensation Commission, Seventh Compensation District, Defendant.**

Civ. A. No. 69–2981.

United States District Court,
E. D. Louisiana,
New Orleans Division.

May 7, 1970.

**148**

David R. Normann, Normann & Normann, New Orleans, La., for plaintiffs.

Leavenworth Colby, Sp. Asst. Atty. Gen., United States Dept. of Justice, Washington, D. C., James D. Carriere, Asst. U. S. Atty., for defendant.

CASSIBRY, District Judge:

This case is before the Court on motion for summary judgment by defendant deputy commissioner. The action is brought by plaintiffs, the employer and insurance carrier, to set aside a compensation award based on injuries occurring in new construction on a graving drydock on September 23, 1968. The jurisdiction of this Court rests on 33 U.S.C. § 921(b), together with the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

Claimant was injured in his employer's combination shipbuilding and repair graving (graven) drydock in which he was building a new, unlaunched barge. The sole question is whether a drydock so used for new construction is a "dry dock" within the meaning of the Longshoremen's Act, 33 U.S.C. § 902(4) and § 903(a).

The deputy commissioner's findings, so far as pertinent to the disputed issue in the case, are as follows:

3) That on said day, the claimant was employed as a welder, assisting in the construction of a barge which was resting on blocks in a graving dock, and while so engaged, he sustained injury arising out of and in the course of the employment and resulting in his disability, when he was leaving the barge, descending a ladder which was resting against the top deck of the barge, the ladder twisted causing him to lose his balance and to fall a distance of approximately 18 feet to the concrete bottom of the graving dock, striking his head, resulting in fracture of the left occipital bone and a bulging hemotympanum in the right ear probably due to a right basilar skull fracture, and injury to the seventh cranial nerve; that as a result of the injuries sustained, the claimant has suffered impairment of hearing and visual efficiency, loss of sense of smell and taste, and continues to suffer from vertigo, all of which have rendered him totally disabled for work since the injury to the present and continuing indefinitely into the future;

4) That at the time of the injury, and for some time prior thereto, the employer's operations, in addition to the construction of new vessels (barges), included the repair of existing vessels upon the navigable waters of the United States, and some of the employees of the employer were employed in such maritime employment upon the navigable waters of the United States (including any drydock);

5) That in the conduct of the employer's operations, two graving docks were used, said docks being adjacent

to navigable waters of the United States (Harvey Canal) with floodgates across the Canal end of the docks which could be opened either for the purpose of floating a vessel in or out of the dock, and they had facilities for draining the docks to expose the underwater portion of a vessel's hull;

6) That the particular graving dock within which the claimant's injury occurred was used primarily for the construction of new vessels which, upon completion, would be floated out of the dock into the adjacent canal; however, on one occasion the front portion of that graving dock had been used for the purpose of repair of several barges, and although this particular dock has not since been used for the repair of vessels, it could be used for that purpose;

7) That it is the judgment of the Deputy Commissioner that the graving dock within which the claimant's injury occurred was (and is) a "drydock" within the meaning of the Longshoremen's and Harbor Workers' Compensation Act, and that the claimant's injury of September 23, 1968 did occur upon navigable waters of the United States as extended by the inclusion of drydocks in defining navigable waters of the United States, as provided by Section 3(a) of the Longshoremen's and Harbor Workers' Compensation Act;

This Court has carefully examined the transcript of the hearing before the deputy commissioner and is in full agreement with his findings as quoted above. The plaintiffs argue that since the drydock in question was being used exclusively for new ship *construction* at the time of the accident, rather than for *repair* work, it is excluded from the "any drydock" language of the Act. This is untenable. The dock in question was not significantly different than a dock used for repairs. It was essentially an inlet or basin from the sea from which water could be floated in or out. Indeed, this very dock had been used for repair work in the past, and could also be used for repair work at the time of the accident.

Gretna's personnel director, Curtis B. Taylor, was called as a witness for claimant in order to describe how Gretna's drydocks had been and could be used as combination building and repair drydocks. Mr. Taylor testified that Gretna had two graving docks: the old or No. 1 dock, used "primarily" for repairs, was split into "two levels"—the "upper" and "lower" repair docks. The new graving dock was at one time divided by an earth levee into front and back sections, dock No. 2 and dock No. 3, although both were on the same level. Three barges had been repaired in the front section—the old No. 2 dock—but at the time of the injury the earth levee had been removed and the entire dock was being used exclusively for new construction.

Mr. Taylor testified with great precision that the new No. 2/3 graven dock, where claimant was injured, could be used for repair work as well as new construction but was not being so used currently because the old No. 1 dock was more conveniently situated for repair work and also because of a large backlog of new construction orders. It may be worth quoting his specific testimony on these points:

Q. If you wanted, if the company, I should say, wanted to repair barges in the new dock, the one in which Mr. Baum was injured in, even at this time could it be done?

A. Yes.

Q. Is there any particular reason why one dock is used primarily for repair work and the other for new work?

A. Yes, there are a number of reasons. The primary being the equipment that, the placement of equipment within the yard and not having to move this equipment, and the number 1 dock is set up primarily for repair work. Also, the expedience with which you can flood this, what we re-

fer to as repair dock, it is much faster and empties much faster. So for expedience purpose, also for working conditions, when you have a repair dock, of course, it's much worse to work in because of working conditions. So the difference between two docks, there are a number of reasons why. [Tr. 48 line 23 through Tr. 49 line 17]

\* \* \* \* \* \*

Q. If they [barges] ran longer than that [360 feet], you would naturally have to repair them in the new dock?

A. If I took the job.

Q. If you took the job. And the same would be true if the barge exceeded, I think you gave 55 feet in width. If it exceeded that width, you would have to go into the new dock to repair it, also, if you took the job?

A. Correct.

Q. And you did indicate that repair work could be done. There is nothing to prohibit repair work being done in the new dock?

A. That 's true, nothing. [Tr. 57]

\* \* \* \* \* \*

[Q] \* \* \* That dock, the new area, is used now exclusively for new construction?

A. That is correct. We have now two and a half years back log and these are also bid on contract and a completion date is necessary, so it would be next to impossible to receive any repair work into what we now consider our new construction because of commitments that we have. [Tr. 58]

Except for the foregoing testimony, the deputy commissioner was obliged to rely on his common knowledge of definitions in Maritime literature and observation of shipbuilding facilities, together with the photographic exhibits. These photographs clearly show the place of Mr. Baum's injury was a graven drydock, and I see no reason for excluding claimant from the coverage of the Act simply because he was building a new ship rather than repairing an old one. The point is that he was working on "any drydock" at the time he was injured. Given the language and purpose of the Act, a drydock is a drydock is a drydock.

Plaintiffs' primary reliance in this case is upon a Ninth Circuit case, O'Leary v. Puget Sound Bridge & Dry Dock Co., 349 F.2d 571 (1965), which held that an injury occurring in new ship construction upon a "building way" was not covered by the Act. But that case is readily distinguishable from the present one, for a "building way" is nothing like a drydock. It is simply an inclined plane and, except for the outermost tip which extends into the water, it is a permanent shipyard structure located entirely on land. As the *Puget* Court itself stated (at p. 573):

"The building way on which the accident occurred is a permanent shipyard structure located entirely on land which was designed and is used exclusively for new ship construction. To facilitate the launching of completed vessels, the outermost or seaward end of the building way extends into the water on an incline. The tide ebbs and flows around this outermost portion."

Unlike a drydock, a "building way" has no essential connection with the sea; no ships can be floated in or out. Thus the building way is *necessarily* used only for new ship construction. A drydock, on the other hand, *because of its ties with the sea,* can be used either for new construction *or* repair. The Act refers to "any drydock" and it does not seem logical to make the coverage of the Act shift with the various uses to which such a dock may be put. To so construe the Act would be to convert its coverage into the proverbial bouncing ball.

Plaintiffs' motions to set aside the deputy commissioner's award is denied.

The deputy commissioner's motion to affirm his award is granted.

The Clerk of Court is directed to enter judgment accordingly.